UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| CATHERINE LYNN CADY, ) | |
| ) | |
|     Plaintiff, ) | |
| ) | |
| v. ) | CAUSE NO. 1:11-CV-00292 |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
|     Defendant. ) | |

## OPINION AND ORDER

Plaintiff Catherine Cady appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying her application under the Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB").[1] (*See* Docket # 1.) For the following reasons, the Commissioner's decision will be AFFIRMED.

### I.  PROCEDURAL HISTORY

Cady applied for DIB in July 2007, alleging disability as of October 1, 2001, which she later amended to November 1, 2008. (Tr. 73-74, 150-51, 187.) The Commissioner denied her application initially and upon reconsideration, and Cady requested an administrative hearing. (Tr. 85-119.) On December 11, 2009, a hearing was conducted by Administrative Law Judge ("ALJ") John Pope, at which Cady (who was represented by counsel), her husband, her sister, and a vocational expert ("VE") testified. (Tr. 25-75.) On February 18, 2010, the ALJ rendered an unfavorable decision to Cady, concluding that she was not disabled because she could

---

[1] All parties have consented to the Magistrate Judge. (Docket # 9); *see* 28 U.S.C. § 636(c).

perform her past relevant work as a customer service representative. (Tr. 12-21.) The Appeals Council denied her request for review, at which point the ALJ's decision became the final decision of the Commissioner. (Tr. 1-8.)

Cady filed a complaint with this Court on August 25, 2011, seeking relief from the Commissioner's final decision. (Docket # 1.) In this appeal, Cady advances three arguments: (1) that the ALJ erred by assigning greatest weight to the opinion of Dr. McGee, her treating orthopaedic surgeon; (2) that the ALJ erred by "disregarding" or "ignoring" her testimony and the testimony of her husband and sister; and (3) that the ALJ committed reversible error when he incorrectly stated at one point in his decision that she had worked as a customer service representative for almost two years, rather than approximately eight months. (Docket # 12.)

## II.  FACTUAL BACKGROUND[2]

### *A.  Background*

At the time of the ALJ's decision, Cady was thirty-one years old; had a high school education and one year of college; and possessed work experience as a customer service representative, cashier, medical historian, nursing assistant, and substitute teacher. (Tr. 17, 31, 33, 69-71, 193.) Cady alleged in her DIB application that she became disabled due to degenerative disk disease, stenosis, and anxiety. (Tr. 187.)

At the hearing, Cady, who is 5 feet, 5 inches tall and weighs 107 pounds, testified that she lives in a one-story home with her husband and nine-year-old daughter. (Tr. 30.) She was currently working as a substitute teacher one to two days a week. (Tr. 32.) In a typical day, Cady independently performs her self care, prepares meals, and does dishes; watches television

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 543-page administrative record necessary to the decision.

and reads books; picks up her niece from school, waits for her daughter and nephew to get off the bus at her sister's house, and then drives her daughter home; and lies down from 6:30 p.m. until bedtime, as well as intermittently throughout the day. (Tr. 39-44, 53.)  Her husband helps by going grocery shopping with her and doing the laundry, dusting, and vacuuming. (Tr. 43, 53.) She visits her sister and mother several times a week. (Tr. 46.)

Cady testified that she suffers from chronic pain in her low back and hips, as well as intermittent shooting pain down her legs. (Tr. 47-48.)  Her pain worsens with physical activity, such as walking. (Tr. 48.)  Cady testified that she takes several medications for her pain, which "sometimes" help but also cause her to feel sleepy (Tr. 39); lying down with her legs elevated and applying heat also helps to relieve her symptoms. (Tr. 49.)  She estimated that in an eight-hour period she could walk for ninety minutes, stand in ten-minute increments for a total of forty-five minutes, and sit for ninety minutes (Tr. 50-51); the most she can lift is a gallon of milk (Tr. 49).

Cady also complained that she has "high anxiety" due to her pain, which causes her to easily "lose focus," and thus she takes Xanax as prescribed by her family doctor. (Tr. 44.)  She attended counseling several years earlier for "just a couple of months" but stopped due to her limited finances. (Tr. 45.)  When asked to provide a specific example of her concentration problems, Cady said that she "forget[s] to . . . do just little things sometimes."[3] (Tr. 47.)

### B. Summary of the Relevant Medical Evidence

Cady injured her back at work in March 2002. (Tr. 251.)  In January 2003, she underwent a diskectomy at the L5-S1 level and, in December 2003, she had a spinal fusion at that same

---

[3] Cady's husband and sister also testified at the hearing and essentially corroborated Cady's testimony. (Tr. 58-67.)

level. (Tr. 252, 260, 369.) After the surgeries, she returned to work with permanent restrictions of lifting no more than ten pounds frequently and twenty pounds occasionally and a sit-to-stand option. (Tr. 240, 247, 249-51, 253.)

In February 2007, Dr. Alan McGee performed a fusion at the L4 to L5 levels on Cady due to degenerative disk disease, diskogenic pain, and spinal stenosis. (Tr. 279-82.) In May, she reported that she was "doing very well" and that her low back pain had "improved dramatically." (Tr. 386.) In June 2007, Dr. McGee released Cady to return to work with the following permanent restrictions: a high back chair with lumbar support; lifting no more than ten pounds; limited twisting, bending, pushing, pulling, and carrying; and alternating between sitting and standing for thirty minutes at a time. (Tr. 379.) In August 2007, Dr. McGee reviewed Cady's x-rays, which showed her fusion to be solid; he advised her to wean herself off of Neurontin and to return to see him as needed. (Tr. 374.)

Thereafter, Cady saw her primary care physicians for a variety of routine health care issues. (Tr. 476-83.) In late October 2007, Dr. J.V. Corcoran, a state agency physician, reviewed Cady's record and concluded that she did not have any severe physical impairments. (Tr. 543.)

In April 2008, Cady underwent a neurological examination by Dr. Rajesh Verma due to her complaints of low back and bilateral hip pain. (Tr. 494-95.) He ordered diagnostic testing, which showed no evidence of foraminal narrowing or nerve root displacement; an EMG and nerve conduction studies were normal and showed no signs of radiculopathy. (Tr. 495, 503-04.) Her gait and strength were normal. (Tr. 495.)

In October 2008, Cady asked her primary care physician for a referral to a pain management physician, reporting that the medication she was taking for her back pain was not

working. (Tr. 484.)  In late November 2008, Cady saw Dr. Roger Lemmen for an evaluation of her back pain. (Tr. 528-29.)  She rated her pain as a "two" or "three" on a ten-point scale and stated that it increased with activity; for example, she said that she needed to lie down after thirty minutes of shopping. (Tr. 528.)  Cady had tenderness in her lumbosacral region, but no deficits in motor functioning, strength, or reflexes. (Tr. 529.)  Because neither a lumbar MRI nor a clinical exam showed significant compression of her nerves, Dr. Lemmen did not recommend further surgery. (Tr. 529.)  He prescribed Vicodin and added a low dose of Methadone, recommended she perform home exercises, and told her to stop smoking. (Tr. 529.)

In December 2008, Cady reported to Dr. Lemmen that her pain was still a "two" or "three" and that she had not noticed any effect from the Methadone. (Tr. 530.)  He increased her Methadone dosage. (Tr. 530.)  The next month, Cady reported that she was doing "about 50% better" with her new dosage, describing her pain as a "one" or "two," but closer to a "one." (Tr. 531.)  Dr. Lemmen continued her medication regimen. (Tr. 531.)  In February 2009, Cady stated her pain level was around a "two." (Tr. 536.)  Dr. Lemmen documented that Cady was "doing well" on her current medication dosage. (Tr. 536.)

In April 2009, Cady told Dr. Lemmen that her low back pain had increased, attributing it to her increased activity with gardening. (Tr. 537.)  She stated that her pain was a "three" on average. (Tr. 537.)  Dr. Lemmen estimated that Cady's overall improvement with her pain was about eighty to ninety percent. (Tr. 537.)  He increased her Methadone and Vicodin dosages. (Tr. 537.)

In June 2009, Cady reported to Dr. Lemmen that she was doing "pretty good," estimating an overall eighty-five percent improvement in her symptoms. (Tr. 538.)  She described her pain

as a "one" or "two" and indicated that she was more active, performing home stretching exercises and walking most days. (Tr. 538.) Dr. Lemmen again noted that Cady was doing "very well" with Methadone, and he continued her current dosage. (Tr. 538.)

In August 2009, Cady told Dr. Lemmen that her pain ranged from a "three" to a "five" and that she wanted to re-apply for disability benefits, having been denied in the past. (Tr. 539.) Dr. Lemmen did not think Cady could lift five to ten pounds with any rapidity and recommended that she lift no more than five pounds at any time. (Tr. 539.) He also noted Cady's report that she could only tolerate about twenty minutes of activity before her pain increased. (Tr. 539.) Accordingly, he opined that Cady would need to be in control of her time at work so that she could take breaks whenever needed. (Tr. 539.) He adjusted her medications. (Tr. 539.)

The next month, Cady stated that her pain had improved since her last visit, describing it as a "two" or "three." (Tr. 540.) Dr. Lemmen thought that Cady was doing reasonably well with Methadone as her primary pain reliever and thus continued her medication regimen. (Tr. 540.) In November 2009, Cady reported that she was doing "pretty good," rating her pain for the past two months as a "two." (Tr. 541.) He continued her current medications and also recommended that she try Decadron for any exacerbations. (Tr. 541.)

Again in December 2009, Cady represented to Dr. Lemmen that she was doing "pretty good" and that she was working occasionally as a substitute teacher. (Tr. 542.) She identified her pain as a "two" or "three." (Tr. 542.) She reported that the Decadron worked "almost like a miracle" and that after the second dose she was nearly pain free. (Tr. 542.) He adjusted her medication regimen to include Decadron on a regular basis. (Tr. 542.)

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

### IV.  ANALYSIS

#### A.  *The Law*

Under the Act, a claimant is entitled to DIB if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an

7

impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[4] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. § 404.1520.  An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).  A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.*  The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

## B. The ALJ's Decision

On February 18, 2010, the ALJ issued the decision that ultimately became the Commissioner's final decision. (Tr. 12-21.)  He found at step one of the five-step analysis that Cady had not engaged in substantial gainful activity since her amended alleged onset date and at step two that her degenerative disk disease was a severe impairment. (Tr. 14.)  At step three, the

---

[4] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a).  The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

ALJ determined that Cady's impairment or combination of impairments were not severe enough to meet a listing. (Tr. 16.)

Before proceeding to step four, the ALJ determined that Cady's symptom testimony was not reliable to the extent it was inconsistent with the following RFC:

> [T]he claimant has the residual functional capacity to perform sedentary work . . ., with the following exceptions: the claimant must be allowed to alternate sitting and standing for 30 minutes at a time. The claimant may only occasionally push and pull, bend, or twist.

(Tr. 16.)

Based on this RFC and the VE's testimony, the ALJ concluded at step four that Cady was able to perform her past relevant work as a customer service representative as actually and generally performed. (Tr. 21.) Accordingly, Cady's claim for DIB was denied. (Tr. 21.)

### C. The ALJ's Consideration of the Medical Source Opinions of Record Is Supported by Substantial Evidence

To begin, Cady contends that the ALJ erred by placing the greatest weight on the physical restrictions assigned by Dr. McGee, her treating orthopaedic surgeon, rather than on the physical restrictions assigned by Dr. Lemmen, her treating pain management physician. Cady's argument, however, essentially equates to a plea to this Court to reweigh the evidence with the hope that it will come out in her favor this time. Of course, a plea to the Court to reweigh evidence is ultimately unavailing. *See Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000) (explaining that the court is not allowed to substitute its judgment for the ALJ by "reweighing evidence").

The Seventh Circuit Court of Appeals has stated that "more weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's

conditions and circumstances." *Clifford*, 227 F.3d at 870; *see* 20 C.F.R. § 404.1527(c)(2). However, this principle is not absolute, as "a treating physician's opinion regarding the nature and severity of a medical condition is [only] entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford*, 227 F.3d at 870; *see Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002); 20 C.F.R. § 404.1527(c)(2).

In the event the treating physician's opinion is not well supported or is inconsistent with other substantial evidence, the Commissioner must apply the following factors to determine the proper weight to give the opinion: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner. 20 C.F.R. § 404.1527(c); *see Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008).

Here, the ALJ discussed the various physical restrictions assigned by the two treating medical sources of record—Dr. McGee and Dr. Lemmen. (Tr. 20.) To review, Dr. McGee instructed Cady not to lift more than ten pounds; to limit twisting, bending, pushing, pulling, and carrying; and to alternate between sitting and standing for thirty minutes at a time. And Dr. Lemmen limited Cady to lifting no more than five pounds and stated that she could only perform activity in twenty-minute increments and thus would need to be in control of her work schedule so that she could take breaks whenever needed.

The ALJ found the restrictions from Cady's two treating physicians to be, for the most

part, "largely consistent." (Tr. 20.)  Indeed, both physicians imposed a fairly limited lifting restriction and indicated that Cady would need to change positions frequently between sitting and standing.  The ALJ noted, however, that Dr. Lemmen's opinion conflicted with Dr. McGee's opinion in that Dr. Lemmen opined that Cady could lift no more than five pounds (rather than the ten pounds assigned by Dr. McGee) and that she needed to be able to take breaks whenever needed.

But the ALJ affirmatively resolved this conflict, ultimately choosing to assign greatest weight to Dr. McGee's opinion and "some" weight to Dr. Lemmen's opinion. (Tr. 20.) In that regard, "[w]eighing conflicting evidence from medical experts . . . is exactly what the ALJ is required to do." *Young v. Barnhart*, 362 F.3d 995, 1001-02 (7th Cir. 2004); *see Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000) (emphasizing that the Court is not allowed to substitute its judgment for the ALJ by "reweighing evidence" or "resolving conflicts in evidence").  In doing so, the ALJ explained: "[Dr. Lemmen's] more severe lifting restriction to five pounds and the opinion that she must have total control over her schedule are not consistent with his treatment notes and clinical findings, which, most recently, indicate 85 percent improvement, increased activity (including gardening), and repeated assessments of pain at the one or two level . . . ." (Tr. 20.)  Of course, "if the treating physician's opinion is . . . internally inconsistent . . ., the ALJ may discount it." *Murphy v. Astrue*, 454 F. App'x 514, 519 (7th Cir. 2012) (unpublished) (quoting *Ketelboeter v. Astrue*, 550 F.3d 625 (7th Cir. 2008)).  Therefore, the ALJ's reasoning as to why he discounted Dr. Lemmen's more severe restrictions is easily traced.

"[I]n, the end, it is up to the ALJ to decide which doctor to believe . . . subject only to the requirement that the ALJ's decision be supported by substantial evidence." *Books v. Chater*, 91

F.3d 972, 979 (7th Cir. 1996) (citation omitted and internal quotation marks omitted); *accord Micus v. Bowen*, 979 F.2d 602, 608 (7th Cir. 1992). Here, the ALJ's consideration of the physical restrictions imposed by Dr. McGee and Dr. Lemmen, Cady's two treating physicians, and his resolution of the conflicts between them is supported by substantial evidence. *See Clifford*, 227 F.3d at 869 (explaining that the court does "not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner" (emphasis added)). Therefore, Cady's argument that the ALJ erred by assigning greatest weight to Dr. McGee's opinion fails to warrant a remand of the Commissioner's final decision.

### D. The ALJ's Credibility Determination Will Not Be Disturbed

Next, Cady contends that the ALJ erred by "disregarding" or "ignoring" her testimony and the testimony of her husband and sister. (Pl.'s Br. 7.) Notably, she does not assert that the ALJ made any specific errors in assessing her credibility, but instead merely alleges that "it was improper and error for Judge Pope to question [her] credibility" when her symptoms were "verified" by her husband and sister. (Pl.'s Br. 9.)

Because the ALJ is in the best position to evaluate the credibility of a witness, his determination is entitled to special deference. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If an ALJ's determination is grounded in the record and he articulates his analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988); *see Ottman v. Barnhart*, 306 F. Supp. 2d 829, 838 (N.D. Ind. 2004), creating "an accurate and logical bridge between the evidence and the result," *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006), his determination will be upheld unless it is "patently wrong." *Powers*, 207 F.3d at

435; *see also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness . . . .").

In determining the credibility of Cady's complaints of disabling limitations, the ALJ thoroughly considered the evidence of record pertaining to her physical and psychological conditions. For example, with respect to her physical impairments, the ALJ observed that Cady's physicians' treatment notes often reflected fairly low pain levels—such as a "two," that she was doing "pretty well" on her medications, and that her pain had improved overall by about eighty-five percent. (Tr. 19.) Of course, an ALJ is entitled to consider the objective medical evidence, or lack thereof, as a factor in assessing credibility and "may properly discount portions of a claimant's testimony based on discrepancies between [the c]laimant's allegations and objective medical evidence." *Crawford v. Astrue*, 633 F. Supp. 2d 618, 633 (N.D. Ill. 2009); *see Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) ("[S]ubjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record."); *Smith v. Apfel*, 231 F.3d 433, 439 (7th Cir. 2000) ("[A]n ALJ may consider the lack of medical evidence as probative of the claimant's credibility."); 20 C.F.R. § 404.1529(c)(2); SSR 96-7p.

And as to her psychological complaints, the ALJ indicated that Cady had no real history of mental health treatment. (Tr. 15.) Specifically, the ALJ observed that Cady was prescribed Zanax by her family physician, even though the record did not reflect that Cady particularly complained of anxiety during the relevant period, and that her family physician never referred her for mental health treatment. (Tr. 15.) Of course, the ALJ is entitled to consider the type of treatment that a claimant has undergone when determining that claimant's credibility. *See Ellis v.*

13

*Astrue*, No. 2:09-cv-145, 2010 WL 3782265, at *20 (N.D. Ind. Sept. 30, 2010) (affirming the ALJ's discounting of claimant's complaints of debilitating fatigue given the discrepancies between her self-reported symptoms and the lack of treatment for the purported condition); 20 C.F.R. § 404.929(c)(3) (considering a claimant's use of medications and treatment measures as two factors in analyzing claimant's subjective symptoms); SSR 96-7p; *see also Simila v. Astrue*, 573 F.3d 503, 519 (7th Cir. 2009).

The ALJ also properly considered Cady's activities of daily living when assessing the credibility of her symptom testimony, noting that she independently performs her self care; drives; transports and supervises children for several hours each day; performs a variety of home care tasks such as meal preparation, doing dishes, and gardening; watches television and reads; goes grocery shopping with her husband; and regularly visits with her sister and mother. (Tr. 15, 17-19); *see Schmidt*, 395 F.3d at 746-47 (considering claimant's performance of daily activities as a factor when discounting claimant's credibility); 20 C.F.R. § 404.1529(c)(3); SSR 96-7p.  In addition, he observed that at the time of the hearing Cady was working part-time as a substitute teacher. (Tr. 14, 17, 20.)  "Although the diminished number of hours per week indicated that [Cady] was not at h[er] best, the fact that [s]he could perform some work cuts against h[er] claim that [s]he was totally disabled." *Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008).

Thus, the ALJ adequately considered the credibility of Cady's symptom testimony in accordance with the factors identified in 20 C.F.R. § 404.1529(c) and ultimately determined that her symptoms were not of disabling severity.  In doing so, the ALJ adequately built an accurate and logical bridge between the evidence and his conclusion, and his determination is not "patently wrong." *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000); *Powers*, 207 F.3d at 435.

Therefore, the ALJ's credibility determination, which is entitled to special deference, *Powers*, 207 F.3d at 435, concerning Cady's symptom testimony will not be disturbed.

Not to be deterred, Cady further contends that the ALJ "disregarded" or "ignored" the testimony of her husband and sister friend about her limitations. But the ALJ did indeed expressly consider Cady's husband's and sister's statements about Cady's physical and mental impairments, penning an entire paragraph about their testimony. (Tr. 18.) Thus, Cady's assertion that the ALJ "ignored" her witnesses' testimony is baseless.

In any event, the ALJ did not necessarily have to independently evaluate the testimony of these two witnesses. If testimony is "redundant," an ALJ does not need to independently evaluate it, since the testimony is not a separate line of evidence. *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993); *see Books*, 91 F.3d at 980; *Herron v. Shalala*, 19 F.3d 329, 337 (7th Cir. 1994); *Brandenburg v. Social Sec. Admin.*, No. 104CV01376DFHWTL, 2005 WL 2148119, at *6 (S.D. Ind. Aug. 2, 2005).

In *Carlson*, for example, the claimant objected to the ALJ's failure to specifically discuss his wife's testimony, but the Seventh Circuit found that the testimony "essentially corroborated Carlson's account of his [symptoms] and his daily activities" and therefore was "essentially redundant." *Carlson*, 999 F.2d at 181; *see also Books*, 91 F.3d at 980 (finding that claimant's brother's testimony was not a separate line of evidence but instead "served strictly to reiterate, and thereby corroborate, [the claimant's] own testimony concerning his activities and limitations"). Here too, the testimony of Cady's husband and sister essentially corroborated Cady's own testimony concerning the limitations caused by her impairments, and, therefore, their testimony did not constitute a separate line of evidence that the ALJ needed to address.

Thus, to the extent the ALJ found Cady's testimony regarding her limitations "to be untenable . . . he necessarily found [her husband's and sister's] supporting testimony similarly not credible." *Books*, 91 F.3d at 980.  As a result, Cady's argument that the ALJ improperly "disregarded" or "ignored" the testimony of her husband and sister is without merit and thus fails to warrant a remand of the Commissioner's final decision.

### E.  The ALJ's Misstatement at One Point in His Decision Concerning Cady's Past Work Does Not Necessitate a Remand of His Decision

Finally, Cady alleges that a remand is warranted because the ALJ at one point in his decision misstated the length of time she worked as a customer service representative.  That is, he stated that she "worked full-time for almost two years after her most recent surgery" (Tr. 20), when, in actuality, she worked as a customer service representative for only about eight months, from March or April 2008 until November or December 2008.

Of course, an "administrative error may be harmless" and "[the Court] will not remand a case to the ALJ for further specification when [it is] convinced that the ALJ will reach the same result." *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011) (citing *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010)).  Doing so would be a waste of time and resources for both the Commissioner and the claimant. *Id.*  Accordingly, "[i]f it is predictable with great confidence that the agency will reinstate its decision on remand because the decision is overwhelmingly supported by the record though the agency's original opinion failed to marshal that support, then remanding is a waste of time" and, therefore, not appropriate. *Spiva*, 628 F.3d at 353; *see also McKinzey*, 641 F.3d at 892 (stating if a review of the records convinces the Court that "no reasonable ALJ would reach a contrary decision on remand," then a remand would not be appropriate); *Walters v. Astrue*, 444 F. App'x 913, 919 (7th Cir. 2011) (unpublished) (noting that

16

the Court "must reverse unless satisfied that no reasonable trier of fact could have come to a different conclusion, in which event a remand would be pointless").

Here, Cady fails to mention that earlier in his decision the ALJ articulated: "[Cady] said she last worked full-time in 2008 as a customer service representative (*from April until approximately the end of November*), but had to stop because she could not sit." (Tr. 17 (emphasis added).) Thus, although the ALJ later misstated the length of time she worked as a customer service representative, he did indeed acknowledge the correct time period earlier in his decision. As such, this Court is convinced that the ALJ would reach the same result on remand, and thus any error the ALJ made was harmless. The Court will not waste time and resources in remanding this decision as a result of the ALJ's misstatement at one point in the decision.[5] *See McKinzey*, 641 F.3d at 892; *Spiva*, 628 F.3d at 353; *see also Fisher v. Bowen*, 869 F.2d 1055,

---

[5] In connection with this argument, Cady conclusorily suggests that the ALJ erred in considering her customer service representative job as "past relevant work." But the VE's inclusion of this job as "past relevant work" is consistent with the regulations, which state that a claimant's past work experience constitutes past relevant work if it "was done within the last 15 years, lasted long enough for [a claimant] to learn to do it, and was substantial gainful activity." 20 C.F.R. § 404.1565; *see Knight v. Chater*, 55. F.3d 309, 315-16 (7th Cir. 1995). Cady testified at the hearing that she performed the job approximately eight months (Tr. 71 ("I started in the spring of '08, so it would have been March/April, and ended in late November, early December.")), and there is no suggestion in the record that she failed to learn the job in that time period.

Cady also argues that the ALJ erred by failing to discuss the VE's testimony that she would not be able to perform any jobs if she were found fully credible (Tr. 73) and in failing to recognize that she quit the customer service representative position job because she could not tolerate sitting. Of course, as already concluded, the ALJ's finding that Cady's subjective symptom testimony was not fully credible is supported by substantial evidence.

Finally, Cady argues that the ALJ's step-five finding is flawed because the sit-to-stand option included in her RFC is not consistent with the Dictionary of Occupational Titles (DOT). This argument also lacks traction, as the VE testified, based upon his experience, that the requirements of the customer service representative position did not exceed Cady's RFC. (Tr. 73); *see Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999) (finding that the ALJ properly relied on the vocational expert's testimony where his "reference to the ADA suggests not that he assumed that assembler jobs required accommodation, but that allowing for an employee to alter between sitting and standing is a prevalent accommodation in the workplace"); *Pena v. Apfel*, No. C-97-4445-VRW, 1999 WL 155699, at *2 (N.D. Cal. Mar. 15, 1999) (concluding that the ALJ's step-five finding was supported by substantial evidence where it was "based strictly on the VE's knowledge that jobs frequently allow for alternate standing and sitting"). Moreover, the ALJ also found that a hypothetical individual of Cady's age, education, experience, and RFC could perform the customer service representative job as it is generally performed or as she previously performed it *with a sit-to-stand option*. (Tr. 21, 70.) Therefore, all of Cady's nitpicks of the ALJ's step-five finding fail at the outset. *See Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004) (explaining that when reviewing the ALJ's decision, the court will "give the opinion a commonsensical reading rather than nitpicking at it").

1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in question of a perfect opinion unless there is reason to believe that the remand might lead to a different result.").

## V.  CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED.  The Clerk is directed to enter a judgment in favor of the Commissioner and against Cady.

SO ORDERED.

Enter for this 10th day of May, 2012.

S/Roger B. Cosbey<br>
Roger B. Cosbey,<br>
United States Magistrate Judge